IN RE: CAESARS ENTERTAINMENT OPERATING CO., INC., et al., Debtors.

Caesars Entertainment Operating Co., Inc., et al., Plaintiffs,

v.

BOKF, N.A., et al., Defendants.

No. 15 B 1145 (Jointly administered)
No. 15 A 149

United States Bankruptcy Court,
N.D. Illinois, Eastern Division.

Signed February 26, 2016

Attorneys for debtors Caesars Entertainment Operating Co., Inc., et al.: James H.M. Sprayregen, P.C., David R. Seligman, P.C., David J. Zott, P.C., Jeffrey J. Zeiger, P.C., Kirkland & Ellis LLP, Chicago, IL; Paul M. Basta, P.C., Nicole L. Greenblatt, Kirkland & Ellis LLP, New York, NY

Attorneys for Wilmington Savings Fund Society, FSB: Timothy W. Hoffmann, Jones Day, Chicago, IL; Bruce Bennett,

James O. Johnston, Sidney P. Levinson, Joshua M. Mester, Jones Day, Los Angeles, CA; Geoffrey Stewart, Jones Day, Washington, DC; Eric R. Wilson, David I. Zalman, Kelley Drye & Warren LLP, New York, NY

Attorneys for BOKF, N.A.: Mark F. Hebbeln, Esq., Harold L. Kaplan, Lars A. Peterson, Foley & Lardner LLP, Chicago, IL; Andrew I. Silfen, Mark B. Joachim, Michael S. Cryan, Arent Fox LLP, New York, NY; Jackson D. Toof, Arent Fox LLP, Washington, DC

Attorneys for MeehanCombs Global Credit Opportunities Master Fund, LP; Relative Value–Long/Short Debt Portfolio, a Series of Underlying Funds Trust; SB 4 CF LLC; CFIP Ultra Master Fund, Ltd.; and Trilogy Portfolio Co., LLC: Timothy R. Casey, Drinker Biddle & Reath LLP, Chicago, IL; James H. Millar, Kristin K. Going, Frank F. Velocci, Brian P. Morgan, Drinker Biddle & Reath LLP, New York, NY

Attorneys for Frederick Barton Danner: Edmund S. Aronowitz, Grant & Eisenhofer P.A., Chicago, IL; Jay Eisenhofer, Gordon Z. Novod, Grant & Eisenhofer P.A., New York, NY; Mark C. Gardy, James S. Notis, Meagan Farmer, Gardy & Notis, LLP, New York, NY

## MEMORANDUM OPINION

A. Benjamin Goldgar, United States Bankruptcy Judge

Before the court on remand from the court of appeals is the motion of the debtors—Caesars Entertainment Operating Co., Inc. ("CEOC") and more than 170 of its subsidiaries—for a preliminary injunction under section 105(a) of the Bankruptcy Code, 11 U.S.C. § 105(a). The injunction would temporarily halt proceedings in four civil actions in other courts against CEOC's non-debtor parent, Caesars Entertainment Corp. ("CEC"), in which the plaintiffs seek to enforce CEC's guarantees of notes that CEOC issued.

After a careful review of the court's first decision, the opinion of the court of appeals, the record from the June 2015 evidentiary hearing, and events in the bankruptcy case and related litigation since the hearing, the court will grant the motion in part and continue it in part for the reasons and on the terms set forth below. *See* Fed. R. Civ. P. 65(d)(1) (made applicable by Fed. R. Bankr. P. 7065).

### 1. Background

Familiarity with the court's first decision is assumed. *See Caesars Entm't Operating Co. v. BOKF, N.A. (In re Caesars Entm't Operating Co., Inc.)*, 533 B.R. 714 (Bankr. N.D. Ill. 2015). What follows is a summary to provide context.

The debtors in these chapter 11 cases are the primary operating units of the Caesars gaming enterprise, an $8 billion international business operation. The debtor in the lead case is CEOC. The other debtors are subsidiaries of CEOC. The majority owner of CEOC is CEC. CEC is not a debtor.

In 2005 and 2006, CEOC issued $1.5 billion in senior unsecured notes due 2016 and 2017. CEC guaranteed CEOC's obligations under the notes. In 2008, CEC and its subsidiaries were acquired in a leveraged buyout. The next year, CEOC issued $3.71 billion in second priority secured notes due 2018. The year after that, CEOC issued another $750 million in second priority secured notes due 2018. CEC guaranteed CEOC's obligations under the second priority notes.

For several years after the 2008 financial crisis, CEOC's revenues declined, and they continued to do so even after the economy began to recover. CEOC found itself with insufficient cash flow to service

the substantial debt remaining from the 2008 LBO, including the notes it had issued before and after. Beginning in 2009, the Caesars enterprise therefore engaged in more than forty-five transactions designed to restructure CEOC's debt (the "disputed transactions"). One, the "B–7 Refinancing," took place in May 2014. Another, the "Senior Unsecured Notes Transaction," took place in August 2014. The precise nature of these transactions is irrelevant. What matters is that CEC contends these transactions released its obligations under the guarantees of the 2016, 2017, and 2018 notes.

To say these transactions angered the noteholders is an understatement. Over the next ten months, indenture trustees and noteholders (the "guaranty creditors") brought a series of actions against CEC to reinstate the guarantees and recover damages for (among other things) breach of the indentures and notes. Wilmington Savings Fund Society, FSB, and BOKF, N.A., indenture trustees for the two sets of 2018 notes, sued CEC separately in the Delaware Court of Chancery and the U.S. District Court for the Southern District of New York. CEC's potential liability in the two actions together comes to $4.46 billion. Frederick Barton Danner brought an action against CEC in the same district as representative of a plaintiff class of 2016 noteholders. MeehanCombs Global Credit Opportunities Master Fund, LP, and other holders of 2016 and 2017 notes also brought an action in that district. CEC's combined potential liability in the Meehan-Combs and Danner actions is $125 million.

In June 2014, CEOC's board formed a Special Governance Committee to investigate all of the disputed transactions (including the B–7 Refinancing and Senior Unsecured Notes Transaction) to determine whether CEOC had claims against CEC or its affiliates arising out of them.

Although the investigation is unfinished, the SGC appears to have found that CEOC indeed has claims, including claims for fraudulent transfers.

Around the same time, the debtors began negotiating with CEOC's first lien creditors and CEC over a possible restructuring. In December 2014, the debtors, CEC, and some of CEOC's first lien noteholders entered into a "Restructuring Support and Forbearance Agreement" (the "Notes RSA"). Under the Notes RSA, CEC agreed to make a significant financial contribution to a restructuring, a contribution the debtors value at more than $2.5 billion. The contribution represents a settlement of CEOC's potential claims against CEC. CEOC agreed in turn that its reorganization plan would release all claims against CEC as well as against its affiliates, shareholders, officers, directors, and others.

Less than a month later, on January 12, 2015, three second lien noteholders filed an involuntary bankruptcy petition against CEOC in the District of Delaware. Three days after that, CEOC and the other debtors filed voluntary chapter 11 petitions in this district. The Delaware bankruptcy court then transferred the involuntary case here.

In March 2015, the debtors filed an adversary complaint and motion seeking, among other things, preliminary injunctive relief under section 105(a) of the Bankruptcy Code, 11 U.S.C. § 105(a), to halt temporarily the prosecution of the Wilmington Savings, BOKF, Danner, and MeehanCombs actions against CEC. The underlying theory was that the four actions threatened the debtors' ability to reorganize. That was so, the debtors said, because the reorganization (as envisioned in the Notes RSA) depended heavily on CEC's financial contribution. CEC lacked the resources to make that contribution

and also pay judgments in favor of the plaintiff noteholders. If the actions were not enjoined and the noteholders succeeded not only in reinstating CEC's guarantees of the notes but also recovering on them, CEC's contribution to the reorganization would vanish. The noteholders would get the money meant to fund CEOC's plan. The debtors would get nothing.

In June 2015, the court held a two-day evidentiary hearing on the debtors' motion and in July 2015 denied it. *See Caesars*, 533 B.R. 714. The motion was denied because the court concluded it lacked the power to grant the relief the debtors sought.[1] The court acknowledged that under many decisions this would be "a textbook case" for a section 105(a) injunction, *id.* at 732, but read the two most recent Seventh Circuit decisions on the subject— *Fisher v. Apostolou*, 155 F.3d 876 (7th Cir. 1998), and *Levey v. Sys. Div., Inc. (In re Teknek, LLC)*, 563 F.3d 639 (7th Cir. 2009)—to allow the issuance of such an injunction only in exceptionally limited circumstances, *id.* at 729. Those circumstances, the court said, had not been shown. *Id.* at 731–32.

The debtors appealed the order. The district court affirmed for essentially the same reasons. *See Caesars Entm't Operating Co., et al. v. BOKF, N.A. (In re Caesars Entm't Operating Co., et al.)*, No. 15 C 6504, 2015 WL 5920882 (N.D. Ill. Oct. 6, 2015). The debtors appealed again and this time were more successful: the court of appeals vacated the order denying their injunction motion. *See Caesars Entm't Op-*

*erating Co., Inc. v. BOKF, N.A. (In re Caesars Entm't Operating Co.)*, 808 F.3d 1186 (7th Cir. 2015).

In its opinion, the court of appeals reasoned that section 105(a) grants bankruptcy courts "extensive equitable powers ... to perform their statutory duties," and "nothing" in that provision (or in the *Fisher* and *Teknek* decisions, *id.* at 1189–90) "authorize[d] the limitation on the powers of a bankruptcy judge" that this court and the district court had found. *Id.* at 1188. Because of their misinterpretation of the statute, the court added, neither court had reached the critical question the debtors' motion presented. *Id.* That question

> is whether the injunction sought by CEOC is likely to enhance the prospects for a successful resolution of the disputes attending its bankruptcy. If it is, and its denial will thus endanger the success of the bankruptcy proceedings, the grant of the injunction would, in the language of section 105(a), be "appropriate to carry out the provisions" of the Bankruptcy Code, since successful resolution of disputes arising in bankruptcy proceedings is one of the Code's central objectives.

*Id.* at 1188–89 (quoting 11 U.S.C. § 105(a)).

The court of appeals then effectively endorsed the theory underlying the debtors' injunction request. "If before CEOC's bankruptcy is wound up," the court said, "CEC is drained of capital by the lenders' suits to enforce the guaranties that CEC had given them, there will be that much

---

1. At some point between the filing of the complaint and the hearing on the motion, the debtors narrowed the scope of the relief sought. Originally, the debtors had asked for the four actions to be enjoined "until the effective date of a restructuring plan." (Adv. Dkt. No. 4 at 15). On March 12, 2015, however, an examiner had been appointed and

charged with investigating the disputed transactions. (Bankr. Dkt. No. 675). At the June 2015 hearing as well as in their post-trial brief, the debtors asked to have the actions enjoined only "until 60 days after the Examiner issues his report." (Tr. v. I at 147; Adv. Dkt. No. 151 at 25).

less money for CEOC's creditors to recover in the bankruptcy proceeding." *Id.* at 1189. "The less capital CEC has for CEOC to recapture through prosecution or settlement of its fraudulent-transfer claims, the less money its creditors will receive in the bankruptcy proceeding." *Id.* What is more, the court continued, "[o]ne can envision a situation in which CEC, having both obligations on the guarantees it issued to CEOC's lenders, and to CEOC arising from the latter's fraudulent transfer claims, would lack the money to satisfy all its obligees .... " *Id.*

The court of appeals noted CEOC's contention "that if the guaranty litigation against CEC can be frozen for a time ..., the bankruptcy examiner's report analyzing the disputed transactions will provide the parties with information they need to have a clear shot at negotiating an overall settlement." *Id.* If that contention is correct, the court said, "there is nothing in section 105(a) to bar the order sought by CEOC" since section 105(a) authorizes orders " 'appropriate to carry out the provisions' of the Bankruptcy Code." *Id.* (quoting 11 U.S.C. § 105(a)).

Whether such an order is appropriate, though, "is a factual issue that remains to be determined." *Id.* The matter was remanded for that determination. *Id.* at 1191.

### 2. Findings of Fact

This court's first decision made extensive findings of fact. *See Caesars*, 533 B.R. at 720–27. Those findings are incorporated by reference. The court now makes additional findings based on (1) the record from the June 2015 hearing, and (2) events both before and after the hearing, all of

which the court has either judicially noticed (*see* Adv. Dkt. Nos. 198, 205), or judicially notices in this decision, *see* Fed. R. Evid. 201(c)(1). Additional findings of fact also appear below in the court's conclusions of law.

#### a. The Guaranty Actions against CEC

Witnesses at the June 2015 hearing warned that the four actions might prompt holders of CEOC first lien notes—notes also subject to CEC guarantees supposedly released—to bring actions of their own. (*See, e.g.,* Tr. v. I at 49). Not two weeks after the June 2015 hearing, UMB Bank, N.A., trustee under certain CEOC first lien indentures, sued CEC in the Southern District of New York. (Adv. Dkt. No. 198, ¶ 6).[2] The UMB complaint alleged that the release of CEC's guaranty of $6.345 billion in CEOC first lien notes violated the terms of the indentures as well as the Trust Indenture Act of 1939 and sought to collect from CEC the $6.345 billion due on the notes. (*Id.*). The UMB action was the fifth contesting the purported release of CEC from its various guaranty obligations and seeking to collect on the notes in question.[3]

The district court in New York deemed the BOKF and UMB actions related (*see UMB Bank, N.A. v. Caesars Entm't Corp.,* No. 15–cv–4634 (SAS), 2015 WL 4064597 (S.D.N.Y.), Dkt. entry dated June 17, 2015), and set a schedule for BOKF and UMB to file motions for partial summary judgment (*id.*, Dkt. No. 19). At the end of June, BOKF and UMB both moved for partial summary judgment on their complaints against CEC. (Adv. Dkt. No. 198 ¶¶ 6–7). In August, the district court de-

---

**2.** The guaranty creditors took the position that the debtors could have orchestrated the filing of the UMB action. (Adv. Dkt. No. 156). Suspicious though the timing may have seemed in July 2015, events since then have dispelled the possibility of a collusive filing.

**3.** UMB is not a party to the adversary proceeding here but has apparently agreed to be bound by a decision on the debtors' motion for preliminary injunction. (*See* Adv. Dkt. No. 152, Ex. D).

nied the motions. (*Id.*). BOKF and UMB later filed a second round of motions for partial summary judgment, and in January 2016 the district court denied those motions as well. (*Id.*). The BOKF and UMB actions are set for trial together on March 14, 2016, a little over two weeks from now. (*Id.*).

The plaintiffs in the MeehanCombs and Danner actions likewise moved for partial summary judgment on their complaints against CEC. (*Id.*, ¶ 8). In December 2015, the district court denied the motions. (*Id.*). The MeehanCombs and Danner actions are set for trial together on May 9, 2016. (*Id.*).

In contrast, no trial date has been set in the Wilmington Savings action pending in the Delaware Chancery Court. (Adv. Dkt. No. 210, Tr. dated February 22, 2016, at 4–5). Fact discovery in the action has closed, but expert discovery is continuing, and there is currently no cut-off. (*Id.*).

### b. Other Litigation Against CEC

During CEOC's bankruptcy case, CEC has been a defendant in other major litigation.

● In December 2014, Hilton Worldwide, Inc. Global Benefits Administrative Committee and others sued CEC in the Eastern District of Virginia. (Adv. Dkt. No. 198, ¶ 11). The complaint sought to enforce CEC's funding obligations under a Hilton pension plan, obligations undertaken when Hilton spun off certain gaming and other operations to Caesars in 1998. (*Id.*). Hilton alleged that $18 million of those obligations was currently due and unpaid. (*Hilton Worldwide, Inc. Global Benefits Admin. Comm., et al. v. Caesars Entm't Corp., et al.*, No. 14–cv–1766 (E.D. Va.), Dkt. No. 1).

The Hilton action was transferred to this district and referred to the bankruptcy court, where the action was docketed as an adversary proceeding. (Adv. Dkt. No.

198, ¶ 11). The plaintiffs then moved to withdraw the reference. (*Id.*). Proceedings in the district court and in the bankruptcy court have been stayed to permit settlement discussions. (*Id.*).

● On January 12, 2015, the same day the involuntary petition was filed against CEOC, the National Retirement Fund (the "NRF"), expelled five CEOC subsidiaries and affiliates from a multi-employer pension plan the NRF sponsored. *See In re Caesars Entm't Operating Co.*, 540 B.R. 637, 640 (Bankr. N.D. Ill. 2015). The NRF had given notice of the expulsion on January 12 and later sent a second notice assessing withdrawal liability under ERISA and demanding payment. *Id.* at 640–41. In March 2015, the NRF and its manager sued CEC in the Southern District of New York to collect unpaid withdrawal liability. (Adv. Dkt. 198, ¶ 9). The parties are currently engaged in settlement discussions. (*Id.*).

That same month, the debtors filed an adversary proceeding in CEOC's bankruptcy case against the NRF's board of trustees and others. The complaint alleged that the notice and payment demand violated the automatic stay and sought to have the NRF's collection efforts against CEC enjoined. (*Id.*, ¶ 10; *see Caesars Entm't Operating Co., Inc., et al. v. Board of Trustees of the Nat'l Ret. Fund, et al.*, No. 15 A 131 (Bankr. N.D. Ill.), Dkt. Nos. 6, 8). The debtors also filed two motions in the bankruptcy case, one asserting that the expulsion violated the stay, the other that the notice and payment demand violated the stay. (Adv. Dkt. 198, ¶ 10). In November 2015, both motions were denied, and two of the three counts in the adversary complaint were dismissed. (*Id.; see Caesars*, 540 B.R. at 647). The debtors have appealed the denial of the motions, but briefing in the appeal has been extend-

ed because the parties are engaged in settlement discussions. (*Id.*).

• In October 2015, Wilmington Trust, N.A., as successor indenture trustee for subordinated unsecured CEOC notes due 2016, sued CEC in the Southern District of New York, to enforce CEC's guaranty of more than $500 million in notes. (*See Wilmington Trust, N.A. v. Caesars Entm't Corp.*, No. 15–cv–8280 (SAS) (S.D.N.Y.), Dkt. No. 1). This brought to six the number of actions against CEC arising out of the purported release of the guarantees. The debtors have not asked to have proceedings in the Wilmington Trust action enjoined.

### c. No CEC Bankruptcy

Witnesses at the June 2015 injunction hearing testified that CEC would likely file a bankruptcy case of its own if judgments were entered in any of the four (now six) guaranty actions against it (Tr. v. I at 55, 67–68, 115–16, 208), and it might do so even before entry of a judgment in favor of BOKF (a ruling on BOKF's first motion for partial summary judgment was then expected in August 2015) (*id.* at 209–10; Tr. v. II at 59–60, 130). CEC did not file a bankruptcy case in August 2015 and still has not filed one. (Adv. Dkt. No. 198, ¶ 5).

### d. The CEOC Bankruptcy Case

As of the June 2015 hearing, the only restructuring agreement the debtors had reached with creditors was the Notes RSA to which four-fifths of the first lien noteholders were parties. (Tr. v. I at 47, 193). The Notes RSA was later amended in July 2015 and amended again in October 2015. (Adv. Dkt. 198, ¶ 1). The debtors had been in discussions earlier in 2015 with CEOC's first lien bank lenders over a possible restructuring agreement, but in April talks had broken off (Tr. v. II at 46).

In August 2015, CEC and CEOC succeeded in entering into a Restructuring Support and Forbearance Agreement with certain of its first lien bank lenders (the "Banks RSA"). (Adv. Dkt. No. 198, ¶ 2). Meanwhile, in July 2015, CEOC and CEC announced a Restructuring Support and Forbearance Agreement with certain second lien note claimants (the "Second Lien RSA"). (*Id.*, 198, ¶ 3). The Second Lien RSA ultimately expired on September 18, 2015, when insufficient noteholders signed on for it to become effective (*id.*).

On October 7, 2015, the same day the Notes RSA was modified, the debtors filed with the court a modified chapter 11 plan. (*Id.*, ¶ 4). The modified plan was not only consistent with the Notes RSA and Banks RSA but also included many terms from the Second Lien RSA despite that agreement's expiration. (*Id.; see* Bankr. Dkt. No. 2402). As the modified disclosure statement the debtors filed at the same time makes clear, the plan takes the same basic form as its predecessor, in that it calls for a substantial financial contribution from CEC in various forms (*see* Bankr. Dkt. No. 2403 at 59–64) and also contains a blanket release of claims against CEC and others (*id.* 69–70; *see also* Adv. Dkt. No. 205).

Later in October, the debtors received a second extension of the exclusive periods during which only they can file a plan and solicit acceptances of the plan, *see generally* 11 U.S.C. § 1121. (Bankr. Dkt. No. 2473).[4] In February 2016, the debtors sought a third and final extension of exclusivity, allowing them until July 15 to file a plan and until September 15 to solicit acceptances—the statutory maximums, *see* 11 U.S.C. § 1121(d)(2)(A), (B). No party objected, and the motion was granted at a February 17 hearing. (Bankr. Dkt. No. 3283). But the Ad Hoc Committee of First

---

**4.** The debtors had sought and received an

initial extension back in May. (*Id.* No. 1454).

Lien Bank Lenders commented in its response to the debtors' request that with the passage of time, the likelihood the two RSAs could form the basis of a consensual plan had "vastly diminished." (*Id.* at 3). The Committee said its patience was "wearing thin," and that without an "impending resolution" it might have to consider "alternative solutions to these cases." (*Id.*).

At the same February 17 hearing, counsel to the examiner gave the court and parties a status report. (*See* Bankr. Dkt. No. 3290). Claims of privilege and confidentiality had delayed the filing of the examiner's report, and earlier in the month the examiner had received permission to file an initial redacted version. (*Id.*, No. 3169). In his seventh interim report filed in February, the examiner had announced he hoped to file his final report by the end of the month. (*Id.*, No. 3203 at 6). On February 17, counsel clarified that the final report would not be filed by that date, but it was still the examiner's intention to file the initial redacted version by February 29. (*Id.*, No. 3290, Tr. dated Feb. 17, 2016, at 21). He has since announced that the initial report will be filed during the week of March 7—and no later than March 14. (*Id.*, No. 3316).

The discussion at the February 17 hearing then turned to this adversary proceeding. Because the debtors had sought a section 105(a) injunction lasting 60 days after the examiner filed his "report," the court asked whether the debtors meant the initial report expected on February 29 or the final one. (*Id.*, No. 3290, at 23–24). The debtors confirmed that "the 60 days would begin from the initial filing rather than from the ... fully unredacted report." (*Id.* at 24).

With that, the debtors also narrowed their request for immediate injunctive relief to the UMB and BOKF trial set for March 14. (*Id.* at 25–26). Because the debtors sought an injunction lasting 60 days from the filing of the examiner's initial report, and because the examiner intended (at that time) to file the initial report on February 29, the injunction would expire before the May 9 trial date in the Meehan-Combs and Danner actions. An injunction aimed at those actions consequently seemed unnecessary. And the debtors agreed, at least for now, saying they were content with "continuing the request ... until such time as we have further visibility into when the examiner's report comes out ...." (*Id.* at 26).[5]

### 3. Conclusions of Law

The debtors' motion will be granted and proceedings in the BOKF action temporarily enjoined. The evidence adduced at the hearing, as well as events post-hearing, demonstrated that an injunction is likely to enhance the prospects for a successful reorganization, an injunction will serve the public interest, and the equities weigh in the debtors' favor. As to the Meehan-Combs and Danner actions, the debtors have agreed for the motion to be continued. And since there is no current need to

---

**5.** The debtors agreed after having an opportunity to consider a question the court had posed earlier in the day. (*See id.* at 25 "Your Honor, while I'm here, you also asked me a question this morning regarding ... the May trial, and given that the debtors are only seeking relief for 60 days from the initial filing of the examiner's report, do you in fact need to decide whether the 105 injunction, if any, should apply to the MeehanCombs and Danner parties ...."). But the question had concerned only the MeehanCombs and Danner actions, not the Wilmington Savings action in Delaware. The debtors have therefore taken no position on whether their request to enjoin proceedings in the Wilmington Savings action should also be continued. For purposes of this decision, it will be assumed the debtors have not agreed to a continuance.

enjoin proceedings in the Wilmington Savings action, the motion will be continued as to that action as well.

▆ To obtain an injunction under section 105(a), it is unnecessary to satisfy the traditional elements for injunctive relief. *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998). As long as the third-party litigation would " 'defeat or impair' " the bankruptcy court's " 'jurisdiction over the case before it,' " the debtor need show only that (1) there is a " 'likelihood of success on the merits,' " *id.* (quoting *In re L & S*, 989 F.2d 929, 932 (7th Cir. 1993)), which in this context means the likelihood of a successful reorganization, *In re Excel Innovations*, 502 F.3d 1086, 1095 (9th Cir. 2007); *Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)*, 402 B.R. 571, 588–89 (Bankr. S.D.N.Y. 2009); and (2) the injunction would serve the public interest, *Fisher*, 155 F.3d at 882. The debtor need not show irreparable harm or an inadequate remedy at law. *Id.*

### a. The Likelihood of Success

▆ The evidence at the hearing (nearly all of which came from the debtors) showed the debtors have a reasonable likelihood of a successful reorganization.

▆ For starters, no one contests the strength of the debtors' business. The business is a "substantial" one (Tr. v. I at 60), operating a "very valuable gaming franchise" with "a. signature property in Las Vegas" (*id.* at 35). The debtors have more than $5 billion in annual revenue and in its most recent year (as of June 2015) generated $1 billion in EBITDA. (*Id.* at 60). The business has "substantial free cash flow after capital expenditures." (*Id.*; see also id. at 63 (calling it "a company with substantial revenues, ... exceeding its own budget")). The critical question in this case, then, is not whether the company can be restructured successfully. Rather, as the court of appeals observed, the question is whether a temporary injunction "is likely to enhance the prospects for a successful *resolution of the disputes* attending [the CEOC] bankruptcy." *Caesars*, 808 F.3d at 1188 (emphasis added).[6]

The evidence strongly suggested that it is.[7] The debtors' goal in seeking injunctive relief is to have a short spell, one during which CEC is not subject to the imminent threat of an adverse judgment, when the parties can negotiate a consensual plan along the lines of the Notes RSA. All parties agree that the estate has "significant claims" against CEC arising out of the disputed transactions. (Tr. v. I at 35–36; *see also id.* at 59 (describing the claims as "multi-billion dollar damage claim[s]")). The Notes RSA, it was explained, embodies a "tentative settlement" of those claims under which CEC would make a "substantial contribution" that the debtors valued at roughly $2.5 billion. (*Id.* at 40–41, 196). Junior creditors have questioned whether

---

**6.** In considering the likelihood of a successful reorganization, courts typically consider not only the strength of the debtor's business but also the progress of the bankruptcy case itself. *See, e.g., Lyondell*, 402 B.R. at 590 (finding the necessary likelihood and granting an injunction where "the Debtors have so far been successful in doing everything they've needed to do to date"). *No party has questioned the progress of this case*—other than, as discussed later, the length of the time it has taken and the possibility that the Banks RSA may be terminated—and the court of appeals framed the relevant question in terms of the "successful resolution of the disputes" in the bankruptcy, *Caesars*, 808 F.3d at 1188, not other matters in the case.

**7.** And in so many words, too. (Tr. v. I at 78 (stating that "the likelihood of [the debtors] being successfully restructured is enhanced by the entry of the stay" (Millstein)).

the contribution is truly "substantial" given the estate's claims, *see Caesars*, 533 B.R. at 726, but they have never contended that a plan funded by CEC would be unacceptable no matter how much CEC paid.

Since the June 2015 hearing, in fact, the debtors have been able to bring other creditors on board with their proposed plan structure. In July, CEOC and CEC announced a Second Lien RSA with certain second lien noteholders. In August, CEC and CEOC entered into the Banks RSA with its first lien bank lenders. Although the Second Lien RSA expired before it became effective because too few noteholders had signed it, on October 7 the debtors filed a modified plan that was consistent with the Notes RSA and Banks RSA and included many of the Second Lien RSA's terms. The modified plan continues to rely on a substantial financial contribution from CEC. The success of the debtors' efforts to date suggests that additional negotiations could well result in a consensual plan based on CEC's funding.

The debtors envision that the examiner's report evaluating the estate's claims against CEC, along with a "market test" the debtors have been conducting (*see* Tr. v. I at 42–43, 98–100), will supply creditors with enough information for meaningful negotiations over CEC's contribution (Tr. v. II at 190–91). The idea is to have the examiner's report and the market test "set the table" for a consensual resolution of the disputes "through the framework that's been established in the [Notes] RSA." (*Id.* at 190).

But the BOKF and UMB actions threaten a reorganization on that basis. As of January, 2015, CEC had a market capitalization of $1.8 billion and an enterprise value of roughly $3 billion, *Caesars*, 533 B.R. at 722, including not quite $400 million in cash (Tr. v. I at 198). If successful, the BOKF and UMB claims alone would result in a judgment of $7.095 billion ($750 million plus $6.345 billion), considerably more than double CEC's value. CEC plainly lacks the ability to pay a judgment that large. (Tr. v. I at 50, 55). A $7.1 billion judgment would deprive CEC of the assets needed to satisfy the estate's claims and rule out any CEC contribution to the plan. (*Id.* at 210 (stating that "these judgments would, in essence, cripple CEC and render it unable to be a participant in the RSA, or in any plan that looks like the RSA")). CEC would end up in a bankruptcy case of its own. (*See id.* at 50–51, 67–68, 72, 115–16, 207–09 (predicting a bankruptcy even before the UMB action was filed)).

As the court noted in its first opinion, these facts describe a "textbook case" for a section 105(a) injunction. *Caesars*, 533 B.R. at 732. Bankruptcy courts have often enjoined litigation against a non-debtor, usually but not always a guarantor of the debtor's debts, who intends to contribute financially to the debtor's reorganization. *Id.; see also In re United Health Care Org.*, 210 B.R. 228, 234 (S.D.N.Y. 1997); *Saxby's Coffee Worldwide, LLC v. Larson (In re Saxby's Coffee Worldwide, LLC)*, 440 B.R. 369, 378 (Bankr. E.D. Pa. 2009); *Regency Realty Assocs. v. Howard Fertilizer, Inc. (In re Regency Realty Assocs.)*, 179 B.R. 717, 719 (Bankr. M.D. Fla. 1995) (calling this the "classic scenario"); *see, e.g., Gander Partners LLC v. Harris Bank, N.A. (In re Gander Partners LLC)*, 432 B.R. 781, 788 (Bankr. N.D. Ill. 2010); *Lazarus Burman Assocs. v. National Westminster Bank USA (In re Lazarus Burman Assocs.)*, 161 B.R. 891, 899 (Bankr. E.D.N.Y. 1993); *F.T.L., Inc. v. Crestar Bank (In re F.T.L., Inc.)*, 152 B.R. 61, 64 (Bankr. E.D. Va. 1993); *In re Kham & Nate's Shoes No. 2, Inc.*, 97 B.R. 420, 428–29 (Bankr. N.D. Ill. 1989); *In re Monroe Well Serv., Inc.*, 67 B.R. 746, 751 (Bankr. E.D. Pa. 1986); *Rustic Mfg., Inc.*

*v. Marine Bank (In re Rustic Mfg., Inc.)*, 55 B.R. 25, 31 (Bankr. W.D. Wis. 1985); *Lahman Mfg. Co. v. First Nat'l Bank (In re Lahman Mfg. Co.)*, 33 B.R. 681, 685 (Bankr. D.S.D. 1983); *Otero Mills, Inc. v. Security Bank & Trust (In re Otero Mills, Inc.)*, 21 B.R. 777, 779 (Bankr. D.N.M. 1982). This case follows the same pattern. The only difference is one of magnitude.

In opposing injunctive relief, the guaranty creditors argue primarily that the Notes RSA cannot serve as the basis for a successful reorganization. A detailed analysis, they maintain, reveals that it demands relatively little from CEC, leaves CEC in control of the reorganized debtors, and provides CEC and others with blanket releases—releases that are invalid as a matter of law. Recent expressions of discontent from the first lien banks, the guaranty creditors add, show that the Banks RSA, if not a dead letter yet, will be one soon.

Whatever merit the guaranty creditors' criticisms of the Notes RSA may have, they do not suggest a successful reorganization is less than likely. The evidence was undisputed that the debtors consider the Notes RSA simply "a framework" for negotiations (Tr. v. I at 25, 40, 64), a "template for a plan" (*id.* at 106).[8] James Millstein, the debtors' restructuring consultant, described the Notes RSA as "a work in process" rather than a final product, one meant to force other creditors "to consider what they would compromise." (*Id.* at 65, 132). "We're here to have an honest conversation about the value of the company, the value of the claims, and try to determine an equitable allocation of that value among the creditors . . . ." (*Id.* at 69). He noted that he had been asked to consider alternatives to the RSA, other approaches. (*Id.* at 41–42). But, he re-

marked, "[w]e have to start somewhere." (*Id.* at 65). Objections to the specifics of the RSAs—the amount of CEC's contribution, the scope of the releases, and so on—prove that the parties have disagreements about the RSAs, not that a resolution of those disagreements is out of the question.

As for the first lien banks, they did complain in a recent filing, a response to the debtors' request for a final extension of exclusivity, that "many months have passed" without progress toward a global resolution of the case. (Bankr. Dkt. No. 3223 at 2). The banks commented that "[w]ith the passage of the time, the likelihood that the RSAs will form the foundation for a consensual plan of reorganization in these cases has vastly diminished." (*Id.*). But the banks' comment simply underscores the debtors' immediate need for relief. The concern is "the passage of time." (*Id.*). Best, then, to grant the debtors' motion and give them breathing space as soon as possible to negotiate an overall settlement.

The guaranty creditors argue that far from interfering with a reorganization, allowing their claims to go to judgment would assist the effort. Judgments, they contend, will answer the question whether CEC is liable on the guarantees, an answer essential to an evaluation of the plan's proposed release of CEC.

Judgments will answer that question, true enough. In seeking injunctive relief, though, the debtors are pursuing a consensual resolution of their bankruptcy case, not answers to the kinds of questions parties litigate at contested confirmation hearings. The debtors want to avoid that hearing if it can be avoided. Without judg-

---

**8.** Randall Eisenberg, the debtors' chief restructuring officer, agreed. (Tr. v. II at 190 (calling the RSA a "framework" meant to create a "path forward" to a "consensual resolution")).

ments, CEC's liability does remain uncertain. But uncertainty produces settlements because settlements avoid risk. At the June 2015 hearing, counsel for some of the guaranty creditors observed that lawyers "talk about cases settling on the courthouse steps." (Tr. v. II at 218). Cases that settle on the courthouse steps settle on the way in to the courthouse, not on the way out.

The guaranty creditors also argue that the debtors can reorganize on a basis other than the RSAs. Because a reorganization on some other basis is possible, the guaranty creditors say, the debtors do not need to have the actions enjoined.

The evidence supported the premise of the argument but not its conclusion. Millstein admitted at the hearing he was considering alternatives to the RSAs that did not involve a contribution from CEC. (Tr. v. I at 43). One "clear alternative," he said, would be to base a reorganization "solely around the values of operating assets." (*Id.* at 44). Because the business is strong, "[w]e can provide a distribution to creditors under a plan of reorganization based on the franchise itself." (*Id.* at 64).

But Millstein explained that the business was just one of the "two significant sources of value"; the other was the estate's claims against CEC arising out of the disputed transactions. (*Id.* at 43–44). A plan based on the strength of the business would still entail pursuing those claims post-confirmation, probably through a litigation trust. (*Id.*). The claims are vital estate assets, in other words, and a reorganization will either settle them (as the RSAs attempt to do) or allow them to be pursued later on for the benefit of creditors. Regardless, the claims remain a critical component of any reorganization, a component that adverse judgments in the guaranty litigation would jeopardize.

Because the debtors' reorganization depends, one way or another, on the estate's claims against CEC, because CEC does in fact "lack the money to satisfy all its obligees," *Caesars*, 808 F.3d at 1189, and because CEC will indeed be "drained of capital by the lenders' suits to enforce the guaranties" if those suits are not enjoined before adverse judgments are entered, *id.* an injunction of the BOKF action, the action with an imminent trial date, is appropriate.

### b. The Public Interest

A temporary injunction halting the trial in the BOKF action also serves the public interest. Enjoining the action will promote an overall settlement as well as the debtors' reorganization.

 In the bankruptcy context, the relevant public interest is the interest in successful reorganizations, since reorganizations preserve value for creditors and ultimately the public. *See Gander Partners*, 432 B.R. at 789 (calling it "one of the most important public interests" (internal quotation omitted)); *Lazarus*, 161 B.R. at 901; *Monroe*, 67 B.R. at 756. The debtors unquestionably have considerable value, not only as a going concern but because of the estate's claims against CEC. (*See* Tr. v. I at 43–44). Enjoining the guaranty litigation—at least, the BOKF action on the brink of trial—will maintain the value of those claims (by protecting the CEC assets that would pay them) while allowing settlement discussions out from under the immediate threat of an adverse judgment. *See Caesars*, 808 F.3d at 1189 (stating that the interest of all creditors in receiving more rather than less in the bankruptcy case "would be furthered by a temporary injunction staying the lenders' lawsuits against CEC").

■ The other public interest relevant here is the interest in settlement itself. *See United Health Care*, 210 B.R. at 234 (declining to exempt creditor from previous section 105(a) injunction based in part on "the public interest in promoting out-of-court settlements"). As the court of appeals said in its opinion, "successful resolution of disputes arising in bankruptcy proceedings is one of the Code's central objectives," *Caesars*, 808 F.3d at 1189, and indeed public policy favors settlements generally, *National Cas. Co. v. White Mountains Reins. Co.*, 735 F.3d 549, 556 (7th Cir. 2013). The purpose of the injunction the debtors want is to give the parties "a clear shot at negotiating an overall settlement." *Caesars*, 808 F.3d at 1189.

The guaranty creditors do not question these interests but contend with some force that their right to recover separately on CEC's guarantees of CEOC's obligations is what they bargained for. Exercising that right unhindered by the primary obligor's bankruptcy is the point of securing a guaranty. *See Lyondell*, 402 B.R. at 593 (noting the argument that "guaranties are an important device in commercial transactions" because they protect parties "from the insolvency of the primary obligor").

■ Of course, "guaranties should be respected and honored wherever possible, and … courts should be wary of placing limits on the enforcement of commercial guaranties except in cases of the most pressing need." *Id.* But that does not mean "the enforcement of guaranties can *never* be blocked." *Id.* at 593–94 (emphasis added). Sometimes "the needs and concerns of other creditors simply trump commercial predictability." *Id.* at 594. This is one of those times—particularly since CEC had no assets other than its equity interest in CEOC when it gave the guarantees. (Tr. v. I at 70). Only as a result of the disputed transactions that give rise to the estate's claims against CEC does CEC have "independent value" that could satisfy the guaranty creditors' claims. (*Id.* at 70–71). The guaranty creditors are competing directly with the estate for the same assets. (*Id.* at 71).

Under these circumstances, the public interests in successful reorganizations and in settlements outweigh the guaranty creditors' interest in enforcing their guarantees.

### c. The Balance of the Equities

The balance of equities also heavily favors granting the debtors' motion.[9] Without an injunction, the debtors stand to suffer very real harm. The guaranty creditors, in contrast, will suffer no particular harm from the temporary injunction the debtors have requested.

The debtors will be harmed if injunctive relief is not granted because the BOKF and UMB actions will proceed to trial and ultimately to judgment. If the result is unfavorable and the guarantees are reinstated and enforced, these creditors stand to obtain a judgment against CEC for $7.1 billion, more than twice the company's value. No longer will CEC be able to make a financial contribution to the debtors' reorganization. CEC will instead file its own bankruptcy. (Tr. v. I at 50 (CEC "will need to avail itself of a bankruptcy proceeding to protect its assets so as to provide an

---

9. As the court observed in its first decision, it is unclear whether the equities must be weighed before issuing a section 105(a) injunction. *See Caesars*, 533 B.R. at 728 n.13. Typically, a plaintiff moving for a preliminary injunction must show the equities favor grant- ing that relief, and some bankruptcy court decisions mention balancing the equities as a necessary step. *See id.* For purposes of this decision, the court assumes (without deciding) that the step is necessary.

equitable distribution to its creditors")). The chances of a global settlement in the CEOC bankruptcy will be slim. The chances of a settlement that CEC funds will be nil.

It gets worse. If CEC files bankruptcy, Millstein said, the debtors will be forced to protect their own rights against CEC: rather than simply file claims in the CEC bankruptcy, the debtors will have to pursue equitable remedies for the return of the assets transferred to CEC in the disputed transactions. (*Id.* at 56–59 ("We will want the assets back and bring them into our estate so as not to have the competition from the guarantee claims diluting our recoveries . . . ."). In effect, the debtors will be "litigating for the return of property from one estate in favor of another estate." (*Id.* at 59). The result will be "a very different bankruptcy case" (*id.* at 50), one with an unrivaled "litigation forum" and massive administrative expenses (*id.* at 57). A CEC bankruptcy, Millstein predicted, would be "one of the great messes of our time." (*Id.*). "[A]ll creditors will regret the day that that occurs." (*Id.*).

The guaranty creditors, on the other hand, stand to lose nothing but time if an injunction is granted—and not much time at that. The BOKF and UMB actions set for trial on March 14 will merely be delayed for a brief period after the examiner submits his initial report. If there has been no resolution of the bankruptcy and the injunction expires, BOKF and UMB will be free to pursue their actions. The guaranty creditors identify no particular harm from a short delay. *See Lazarus*, 161 B.R. at 901 (finding no harm where injunction would "merely delay the enforcement" of creditor's rights); *F.T.L.*, 152 B.R. at 64 (same); *Monroe*, 67 B.R. at 755 (same). Certainly, any harm to them fails to compare with the potential harm to the debtors if injunctive relief is denied. *See Lyon-*

*dell*, 402 B.R. at 592 (finding the balance weighed in favor of debtors where creditors would "merely be delayed somewhat" if an injunction were granted and its denial would produce an "incalculable disaster").

The guaranty creditors, though, object to any delay at all. They point out that CEC is a defendant in other litigation, litigation the debtors have not sought to stop, and they see no reason why their actions should be delayed when others are not.

The guaranty creditors are mistaken. The debtors' adversary proceeding against NRF sought what was effectively a section 105(a) injunction, and they moved for that relief. (*See Caesars Entm't Operating Co., Inc., et al. v. Board of Trustees of the Nat'l Retirement Fund, et al.*, No. 15 A 131 (Bankr. N.D. Ill.), Dkt. Nos. 6, 8 (incorrectly seeking to "extend[ ] the automatic stay")). All litigation between the debtors and NRF in this district has since been stayed or deadlines extended by agreement to allow the parties to discuss settlement. Litigation between Hilton and the debtors has likewise been stayed by agreement for the same purpose. The debtors have not asked to have the UMB action enjoined, but UMB has agreed to be bound by the order addressing the BOKF action. The debtors have not asked to have the Wilmington Trust action enjoined, but that action is in its early stages. CEC only filed its answer at the end of November 2015 (*Wilmington Trust, N.A. v. Caesars Entm't Corp.*, No. 15–cv–8280 (SAS) (S.D.N.Y.), Dkt. No. 24), and the docket in the action shows no trial date has been set.

At the June 2015 hearing, the guaranty creditors also contended that CEC's threat to file bankruptcy was a bluff. Given the chance, they would doubtless argue now that subsequent events have proved them right: nine months have passed since the

hearing, and CEC still has not filed bankruptcy.

No evidence at the hearing showed CEC was bluffing. Steven Zelin, senior managing director at Blackstone Group (CEC's investment banker and financial advisor), specifically rejected the notion. (Tr. v. II at 59–60). Although CEC has indeed not filed bankruptcy yet, none of the guaranty actions has gone to judgment. The evidence was clear last June that with BOKF about to move for summary judgment, CEC was considering a bankruptcy filing (Tr. v. I at 116, 209), and there was a "substantial risk" CEC would file one (*id.* at 116; *see also id.* at 55, 67–68, 208–10; Tr. v. II at 59–60, 130). Just days after the hearing, UMB filed its action seeking more than $6 billion, and the BOKF and UMB actions are on the brink of trial. Whatever the situation last June, CEC now risks an adverse judgment more than double the value of the company. A judgment that size will compel a bankruptcy.

The guaranty creditors complain, finally, that an injunction will effectively grant CEC bankruptcy relief without CEC's filing a bankruptcy. Quoting *Saxby's Coffee*, the guaranty creditors argue that "to enjoy the benefits of bankruptcy a recipient needs to suffer the burdens." *Saxby's Coffee*, 440 B.R. at 378 (internal quotation omitted); *see also In re National Staffing Servs., LLC*, 338 B.R. 35, 37 (Bankr. N.D. Ohio 2005).

■ The principle the guaranty creditors cite is sound enough. What *Saxby's Coffee* actually said, though, is that the issuance of a section 105(a) injunction is "an exception" to that principle. *Id.* Because it is, courts do stress that injunctive relief under section 105(a) is an "extraordinary and drastic remed[y]," *Regency,* 179 B.R. at 720; *National Staffing*, 338 B.R. at 37 ("a dramatic measure to be used cautiously"), one to be invoked "sparingly," *In*

*re Third Eighty–Ninth Assocs.*, 138 B.R. 144, 146 (S.D.N.Y. 1992) (internal quotation omitted), and in "limited circumstances," *Teknek*, 563 F.3d at 648. And it should be invoked sparingly not least because it is no small matter to "meddle with proceedings in another court . . . ." *Caesars*, 533 B.R. at 733.

Under the circumstances here, however—where a brief delay of the BOKF action will give the parties an opportunity to negotiate an overall settlement of this "immense, and immensely complicated," bankruptcy, *Caesars*, 808 F.3d at 1187, enhancing the prospects of settlement and potentially staving off "one of the great messes of our time" (Tr. v. I at 57)—injunctive relief is clearly " 'appropriate,' " *Caesars*, 808 F.3d at 1189 (quoting 11 U.S.C. § 105(a)).

### d. The Wilmington Savings Action

■ With the BOKF action enjoined and the debtors' motion to enjoin the MeehanCombs and Danner actions continued, only the Wilmington Savings action remains. Unlike the BOKF action, no trial date has been set in that action. Fact discovery has concluded, but expert discovery is continuing without a cut-off. Preliminary injunctions are meant to be emergency relief, granted when there is "an urgent need for speedy action to protect the movant's rights." *Alert Holdings, Inc. v. Interstate Protective Servs., Inc. (In re Alert Holdings, Inc.)*, 148 B.R. 194, 201 (Bankr. S.D.N.Y. 1992). If there is currently no urgent need to enjoin the MeehanCombs and Danner actions with a May trial date, there is no need whatever to enjoin the Wilmington Savings action with no trial date. The debtors' motion will be continued as to the Wilmington Savings action as well.

### e. Bond

Citing Rule 65(c) of the Federal Rules of Civil Procedure, the guaranty creditors ar-

gue that at the very least the debtors should have to post a bond. When a preliminary injunction is entered in a civil action in the district court, Rule 65(c) demands a bond. Fed. R. Civ. P. 65(c); *see Roche Diagnostics Corp. v. Medical Automation Sys., Inc.*, 646 F.3d 424, 428 (7th Cir. 2011) ("Normally, an injunction bond or equivalent security is essential."). Bankruptcy Rule 7065, on the other hand, provides that a "preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c)." Fed. R. Bankr. P. 7065; *see In re Gervin*, 300 Fed.Appx. 293, 300 (5th Cir. 2008) (finding the bankruptcy court did not abuse its discretion in refusing to require a bond); *Lyondell*, 402 B.R. at 594–95 (noting that Rule 7065 makes "posting a bond optional" and declining to require one).

No bond will be required. The guaranty creditors offer no reason (apart from the inapplicable Rule 65(c) itself) for requiring one. They have not shown, or even attempted to show, that a preliminary injunction will damage them in any way. At most, the injunction will delay the guaranty creditors' in asserting their rights for a time, but that time will be reasonably short. The chances that these creditors sustain any damage from the delay are consequently remote. Because they are remote, there is no reason to "depart from the general rule" in bankruptcy cases that a bond is unnecessary when a debtor in possession is granted preliminary injunctive relief. *Lyondell*, 402 B.R. at 595.

### 4. Conclusion

The motion of debtors Caesars Entertainment Operating Co., Inc. and subsidiaries to stay or in the alternative for injunctive relief is granted in part and continued in part. As to defendant BOKF, N.A., the motion is granted. BOKF, N.A.

is enjoined from pursuing the action styled *BOKF, N.A. v. Caesars Entertainment Corp.*, No. 15–cv–1561 (SAS) (S.D.N.Y.), until (a) 60 days after the examiner files his initial report in the bankruptcy case, or (b) May 9, 2016, whichever comes first. As to the remaining defendants, the motion is continued for further status. A separate scheduling order will be entered.